# COURT OF APPEALS OF VIRGINIA

**Record No. 0243-25-4**

DONTAE LASHAWN DRUMGOLD

v.

COMMONWEALTH OF VIRGINIA

Present: Judges O'Brien, Causey and Bernhard

Argued by videoconference

Opinion Issued July 21, 2026

### FROM THE CIRCUIT COURT OF THE CITY OF ALEXANDRIA
James C. Clark, Judge

Sebastian M. Norton (King, Campbell, Poretz & Mitchell, PLLC, on brief), for appellant.[1]

Timothy J. Huffstutter, Assistant Attorney General (Jason S. Miyares,[2] Attorney General, on brief), for appellee.

## PUBLISHED OPINION BY
## JUDGE DAVID BERNHARD

A jury in the Circuit Court of the City of Alexandria convicted Dontae Lashawn Drumgold of the first-degree murder of his roommate, Elijah Williams, and of the use of a firearm in the commission of that murder, in violation of Code §§ 18.2-32, -53.1, and the court sentenced him to 53 years of active incarceration. The Commonwealth secured that verdict without a recovered weapon, an eyewitness, or a confession, resting instead upon a convergence of circumstance: a .22 caliber rifle Drumgold bought and never produced; ammunition and gunshot residue answering to the fatal round; a deepening quarrel over rent and an eviction set to take effect on the very morning

---

[1] Different counsel represented Drumgold before the circuit court.

[2] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

Williams was killed; and journals in which Drumgold rehearsed how to "whack" a man and avowed a preference for "a bullet to the head."

Drumgold assigns six errors, contending the circuit court wrongly barred his evidence of third-party guilt, denied his motion to suppress the journals seized from his bedroom, admitted irrelevant and prejudicial proof that he had feigned membership in a fraternity, refused to strike the evidence on each count, and declined to order a second competency evaluation before sentencing. We hold that his proffer of third-party guilt did not point directly to the guilt of another; that the officers' perusal of the journals stayed within the scope of a valid warrant; that his objection to the fraternity evidence was not preserved for appeal; that the circumstantial proof permitted a rational jury to find beyond a reasonable doubt both that Drumgold was the criminal agent and that he killed with premeditation; and that the circuit court did not abuse its discretion in declining a second competency evaluation. Accordingly, we affirm the judgment of the circuit court.

BACKGROUND

I. Events Preceding Drumgold's Arrest

In March 2022, Williams resided in an Alexandria, Virginia apartment with Drumgold. On March 23, 2022, around 6:10 or 6:20 a.m., Hermela Yitresu was driving to work when she noticed that the door to Williams's apartment building was "wide open" and bright light was coming from the interior of the building. As she drove further down the street, Yitresu observed a bike propping the door open and a person dressed in black lying next to the bike. Yitresu did not see anyone else at the time and, believing the person lying on the floor was drunk, she continued on to work.

Laura Phillips, a second-floor resident of Williams's building, testified that around 6:30 a.m. on March 23, she opened the front door to her apartment and saw that the front door of the building was open, "which was unusual." As she approached the building's front door, she

noticed a bike wheel propping the door open. She stepped around the bike to go outside and observed a person lying on the ground, partially in the mulch and bushes, facing the building. Phillips said something to the person and lightly pushed them, but the person did not respond. Phillips then called 911.

Alexandria Fire Department Lieutenant Jeffrey Prodoehl arrived at the apartment building around 6:50 a.m. and pulled the body out of the bushes. Lieutenant Prodoehl noticed some swelling and blood around the body's face. Around 6:55 a.m., he pronounced the man dead.

Detective Michael Whelan arrived at the building around 7:00 a.m. Based on credentials attached to the decedent's waistband, Detective Whelan identified the deceased as Elijah Williams. Police officers canvassed the area, but no one stated they had heard or seen anything. Shortly after police arrived at the scene, officers determined that Williams resided in apartment 403. Officers obtained a warrant to search the apartment for forensic evidence, blood, and all of Williams's electronic devices. Upon entering apartment 403, officers encountered Drumgold, and police learned that Drumgold and Williams were roommates. When executing the search warrant, officers noticed two .22 caliber rounds in the living room but did not collect them at that time. Officers also observed spackle for repairs and "four rounds of .9-millimeter [sic] ammunition" on the second floor of apartment 403. Police noted that Drumgold had access to a fire escape from his bedroom located on the second floor of the apartment.

Detectives Ryan Clinch and Bikeramjit Gill arrived at apartment 403 around 9:00 a.m. They encountered Drumgold in the apartment and "told him that there was a male outside that was laid to [sic] on the ground, and we thought maybe he had been living in that apartment." Drumgold told the detectives that Williams was his roommate and that they had known each other for about three years but had been roommates "for about four to five months." Drumgold

informed the officers that Williams, who was employed as a security guard, routinely left for work at 5:45 in the morning. Drumgold told the officers that he was unemployed but was attempting to become a security guard himself. When asked when he had last seen Williams, Drumgold first responded two days ago but changed his answer to a week and then to six days during the course of the conversation. He noted that he had not seen Williams the night before the murder, but he did hear "him come home around 11:00 p.m., and he heard him making beats in his bedroom." At trial, Detective Clinch testified that Drumgold told the detectives that "he went to sleep around 11:30." He also testified that, when the detectives told Drumgold that Williams was the decedent, Drumgold said "it was . . . a really fucked up situation because . . . [Williams] was covering the bills for him." Drumgold gave the detectives his cell phone number.

After the detectives informed Drumgold that Williams was dead, Drumgold consented to going to the police station for a voluntary interview. At the station, Drumgold told the detectives that he and Williams split the rent evenly and "had an agreement that, you know, if you're not paying, I'm not paying sort of deal." Drumgold was "concerned about the bills and being evicted" and told the detectives "[t]hat he would ask his parents for money." Drumgold again stated that he had not interacted with Williams the night before the murder but had "heard him come home and heard him making beats from his bedroom." Drumgold stated that on the morning of March 23, "he didn't hear anything except the flicking, closing of the front door of the apartment around 5:45, 5:46 in the morning." When asked about his text messages or phone calls with Williams, Drumgold informed the detectives that "he regularly deletes his messages." Drumgold allowed the detectives to look at his phone, but he did not permit them to copy the data on the phone because "there [were] some things on there that he didn't want anybody to

see," specifically "some notes about a fraternity." At the end of the interview, Drumgold left the station.

On March 24, 2022, Dr. Audrea Williams performed an autopsy on Williams's body. Detectives Gill and Clinch were present during the autopsy. Dr. Williams observed a gunshot wound near Williams's left eye, which she determined was the cause of death. There was no exit wound, and Dr. Williams recovered bullet fragments from the wound, which she then gave to the police. She testified at trial that the bullet ruptured the muscle around Williams's left eye and injured his brain.

At trial, Bronwyn McMaster, an expert in forensic firearm and ammunition examination and comparison, testified that the recovered bullet fragments were "consistent in design with being a .22 short . . . or long rifle." She noted, however, that she "wasn't able to definitively determine the caliber." Additionally, she testified that the sound of a .22 caliber round being fired typically produces less noise than larger caliber firearms. On cross-examination, McMaster confirmed that there were at least ten different brands of rifles that could fit a .22 caliber bullet or cartridge.

Upon learning from Detectives Gill and Clinch that a bullet fragment had been discovered in Williams's head, police officers, including Detective Michael Whelan, returned to the entrance of the apartment building on March 24, 2022, to look for any evidence, such as bullet casings, they may have missed. Police did not find any evidence relating to firearm usage on the outside of the building. While the officers were outside, Drumgold approached Detective Whelan and told him he was going to a job interview. As Drumgold was walking away, Detective Whelan seized Drumgold's cell phone after being told by Detective Gill that the police had probable cause to seize the phone. At trial, Detective Whelan testified that he did not tell Drumgold that Williams was killed by a gunshot wound to the head.

After the autopsy, Detectives Clinch and Gill interviewed Drumgold at the police station on March 24, 2022. At trial, Detective Gill testified that when the detectives asked Drumgold what he thought had happened to Williams, Drumgold "said Elijah was shot." At no point prior to this interview had the detectives told Drumgold that Williams had been shot. Subsequently, the detectives disclosed to Drumgold that Williams "was shot with a small caliber ammunition." Detective Gill asked Drumgold about guns. Drumgold told the detectives that "[h]e was not allowed to have firearms" "[b]ecause he believed he was lawfully not allowed to have it based on his criminal history" and his status as a felon. The police later learned that Drumgold was not in fact a convicted felon and that Drumgold had participated in trainings to become a security guard, including "security officer entry level," "armed security officer arrest authority," and "handgun entry level" taken in September 2021, December 2021, and January 2022, respectively.

On March 24, 2022, after Detectives Clinch and Gill interviewed Drumgold, the police acquired a second search warrant to search apartment 403 for guns; "paraphernalia related to firearms," including "paperwork related to possession and purchasing of the firearms"; "[d]ocumentation/paperwork relating to indicia of occupancy"; and cell phones located in the apartment. Upon execution of the search warrant, police officers collected a paper shooting target and the two .22 caliber rounds from the living room. From Drumgold's bedroom, officers collected a letter addressed to Drumgold and Williams dated March 9, 2022, of eviction from the apartment if rent was not paid by March 23, 2022, the day Williams was killed. Police officers also collected a BB gun, a round of .22 caliber ammunition, additional paper shooting targets,

two holsters, and a gun cleaning kit.[3]  The gun cleaning kit included .17 caliber and .22 caliber cleaning brushes, which were both dirty and contained traces of gunshot residue.

During the search, police inspected some of the notebooks[4] in Drumgold's bedroom, but these notebooks did not contain any of the items sought in the search warrant.  At trial, Detective Clinch testified that the contents of the notebooks were important because they held "talk[] of killing."  On the same day as the execution of the second search warrant, police officers sought and obtained a third search warrant[5] to search the contents of the journals.  In the attachment to the affidavit for the third search warrant, Detective Matthew Kramarik mentioned the notebook entries that the officers had observed during the execution of the second search warrant.  The following entries were listed in the attachment:

1. "How to properly whack a nigga, that just comes down to location, state/region, then you pinpoint which city they in, after that then it comes down to their daily activities, let's say they go to a certain store quite often if you have the man power you can post someone in front of the stores since you know they city matter of time till they pop up."

2. "The 'drumgolds' legacy . . . the title Godfather was earned not given + you should be proud to wear it"

3. "I prefer a bullet to the head it typically does the trick, but see the game is only fun if you don't get caught."

---

[3] Investigator Allen testified that, on March 30, 2022, police collected a .22 caliber cartridge and a BB gun from Drumgold's bedroom.  It is unclear whether the second search warrant was executed on March 24, 2022, or March 30, 2022.  In other parts of the trial transcripts, other law enforcement officials appear to testify that the second search warrant was executed on March 24, 2022, but the BB gun that was collected from Drumgold's bedroom seems to be the same as the one collected on March 30, 2022.

[4] Throughout the trial, "journals" and "notebooks" were used interchangeably.

[5] The third search warrant also authorized searching the apartment for laptops, electronic storage devices, and a *Django Unchained* movie.

At trial, Detective Gill testified about other entries in the notebooks found in Drumgold's apartment. In one of the entries, Drumgold stated, "I had a dream about a lion in a room. I was playing around, scared, but not really. Ended up beating Elijah's ass." Another entry stated, "Shoot bullet to make sure there is no serial number on it." In another journal, Drumgold entitled a page "Blood Gang" and appeared to have written steps for rising in a gang. For example, Drumgold wrote, "Catch a body. Congratulations your [sic] officially a Blood level 14." According to Detective Gill, "catch a body" means "to murder, to have a body as a result of murder." In a subsequent entry, Drumgold wrote, "My roomate [sic] tried that same shit." Detective Gill also testified that in another journal, Drumgold wrote:

> [A]re they playing with your time or happiness? There are multiple ways to solve these issues. I prefer a bullet to the head. It typically does the trick, but see the game is only fun if you don't get caught. Understand getting caught is a life sentence. My fee. But getting away is an entirely different feeling. First, you're going to feel anxiety, mainly because it's like you know you got away with it. But it's still a slight chance that you will get caught. To end these problems, I prefer to dig the hole before blowing someone's brains out. It saves the time and worry of what to do next.

On March 25, 2022, police searched the trunk of Drumgold's car and observed a shovel, pickaxe, tarp, and muddy boots. Those items were subsequently collected around March 31, 2022. On March 30, 2022, Detective Clinch executed another search warrant at the apartment. During that search, police found "little BB holes" on Williams's bedroom door and in Drumgold's bedroom.

During the investigation, police reviewed Drumgold's text messages retrieved from Drumgold's iCloud. In October 2021, Christopher "Ricky Spanish" Santiago[6] told Drumgold

---

[6] At trial, Santiago testified that he had obtained an immunity deal in exchange for his testimony and that he was a convicted felon.

about a .22 caliber Remington rifle he was holding as collateral for a loan to Kevin Gallman.[7] Drumgold expressed an interest in purchasing the rifle, and Santiago sold it to him in October 2021 for $220. Santiago testified at trial that when he gave the rifle to Drumgold, Drumgold said, "I could blow a nigga's head off." During the investigation, the police discovered receipts showing Drumgold purchased .22 caliber rifle ammunition in November 2021 and 9 mm ammunition in December 2021.

On December 17, 2021, Williams texted Drumgold to stop shooting a gun in the apartment. Drumgold replied, "Whatever." Williams followed up, informing Drumgold that there was a bullet in his door, and the two argued about repairing the damage done by the bullet. In February 2022, Drumgold and Williams argued over text about paying the rent. During the exchange, Williams told Drumgold that Drumgold was short by $300 on his portion of the rent payment. Drumgold informed Williams that he could not or would not ask his parents to borrow $300.

In the days leading up to Williams's murder, Drumgold texted his mother about Drumgold moving out of the apartment and his financial issues. Drumgold's mother provided Drumgold with links to apartments and gave him advice on moving out. Three days before Williams's death, Drumgold's mother texted Drumgold, "Please control yourself and try to move instead of going to jail and losing everything, to include your future."

On the night before Williams's murder, Drumgold's cell phone was active from approximately 10:06 p.m. until approximately 8:55 a.m. on March 23, 2022. Between 11:00

---

[7] Gallman's father testified that the rifle in a picture shared between Santiago and Drumgold looked like the bolt-action rifle his father owned. Gallman's uncle similarly testified that the rifle in the photo looked like a gun his father had owned. Gallman's uncle further testified that he did not find his father's guns when cleaning out his father's house, and the uncle did not know what happened to the guns. Both Gallman's father and uncle testified that their father purchased his guns from Sears or Western Auto. When searching Drumgold's car on May 8, 2023, police found a Sears catalog from fall of 1900.

p.m. and 4:00 a.m., Drumgold's cell phone activity showed him texting with his mother and searching apartment and firearms websites. On March 23, 2022, after Williams's death, Drumgold and his mother were texting about his financial issues, but they did not discuss that Williams had been found dead that morning.

On May 8, 2023, a grand jury indicted Drumgold for the first-degree murder of Williams and the use of a firearm while committing murder. Drumgold was arrested on May 9, 2023. Detectives Gill and Clinch interviewed Drumgold at the police station. During this interview, Drumgold stated he went to bed around 3:00 or 4:00 a.m. on March 23, 2022. Drumgold told the detectives that he had only purchased 9 mm ammunition and had never purchased .22 caliber ammunition. Drumgold did not deny that he purchased the rifle from Santiago but asserted that he did not remember what happened to it. The .22 caliber rifle was never recovered.

II. The Trial

A. The First Competency Motion

Before trial, on November 14, 2023, counsel for Drumgold moved for a competency evaluation pursuant to Code § 19.2-169.1, seeking to have Drumgold examined to determine his mental condition and his ability to assist counsel. The circuit court granted the motion and ordered that Drumgold be evaluated for competency.[8]

Dr. Melissa Stormer prepared the competency evaluation. She noted Drumgold reported that he sustained "a head injury during a previous incarceration, which required hospitalization" at Western State Hospital. Drumgold stated "that he fell off the top bunk of a bunk bed while

---

[8] The transcript of the November 30, 2023 hearing on the first competency motion was not timely filed under Rule 5A:8(a) and is therefore not part of the record on appeal. *See* Rule 5A:8(a); *Bay v. Commonwealth*, 60 Va. App. 520, 528-29 (2012). Because that transcript is not indispensable to our resolution of Drumgold's challenge to the denial of a second competency evaluation, which we decide on the competency evaluation report, the circuit court's competency finding, and the timely transcript of the second competency hearing, we do not rely on it. *See* Rule 5A:8(b)(4)(ii); *Turner v. Commonwealth*, 2 Va. App. 96, 99 (1986).

incarcerated in 2020." Dr. Stormer noted that Drumgold may have been taking a medication used to treat bipolar disorder but concluded that he was likely malingering. She highlighted that Drumgold's "thought process was logical and organized" and that "he was able to engage in rational discussion, he maintained attention and focus, he was oriented to person, time, and place, and he understood the reason for the interviews." Based on her evaluation, Dr. Stormer determined that Drumgold showed a "high likelihood of feigning symptoms of mental illness." Dr. Stormer also noted that, despite Drumgold's "report of audio and visual hallucinations and severe sleep disturbance, he displayed a high level of cognitive functioning, and his thought process was organized and rational." Drumgold's reported symptoms were "inconsistent with what is typically reported by individuals experiencing genuine psychosis." Ultimately, Dr. Stormer opined that Drumgold "is *feigning* symptoms of mental illness in an attempt to secure a transfer to a mental health hospital" and determined that Drumgold was competent to stand trial. Based on the competency evaluation report prepared by Dr. Stormer, the circuit court found that Drumgold was competent to stand trial.

B. Motion to Regulate Evidence of Third-Party Guilt

Early on in the police investigation, Drumgold attempted to provide the police with suspects. Drumgold told police that Williams was friends with "Black males from D.C." who could be suspects. He also pointed to Ashley Archer and Eduard Velasco as potential suspects.

As part of the investigation, Detectives Gill and Clinch interviewed Archer, Velasco, and Drumgold's parents. The detectives interviewed Archer on the evening of March 24, 2022, in Prince William County. Police interviewed Velasco in the early hours of March 25, 2022, in Stafford. Detective Gill obtained Archer's and Velasco's phone numbers and subsequently

obtained their phone records, which were analyzed by another officer.[9]  Police did not pursue further investigation of Archer or Velasco after analyzing their phone records.

On February 15, 2024, the circuit court heard the Commonwealth's motion to regulate evidence of third-party guilt.  The Commonwealth did not ask that all evidence concerning third-party guilt be prohibited but requested that the court prohibit Drumgold "from presenting evidence that merely suggests or insinuates that a third-party may have committed the murder."  The circuit court deferred ruling on the motion, stating that the motion was premature and would be ruled on shortly before or during the trial.

On May 9, 2024, less than two weeks before trial was set to begin, the Commonwealth renewed the motion to regulate evidence of third-party guilt.  The Commonwealth argued that "[u]nless and until this defendant can produce evidence that directly points to the guilt of a third party, they should not be allowed to introduce evidence of the proverbial boogeyman."  The Commonwealth did note that if Drumgold could "proffer facts and circumstances that clearly point to another person as the guilty party, that evidence still must be admissible."

The defense identified other alleged perpetrators: an unknown individual who "was loitering in the area," an unknown individual who "was jumping on some cars in the area at the same time when this incident, murder, took place," Archer, and Velasco.  The defense represented that Archer was Williams's former girlfriend and that Archer and Williams were in an active custody dispute over their child.  The day before the murder, a custody hearing was scheduled to take place, but no one appeared.  With respect to Velasco, the defense represented

---

[9] After Detective Gill testified to this, Drumgold then requested a bench conference to ask the court if he could ask if Detective Gill "pull[ed] a criminal history" on Archer and Velasco.  The court stated that "criminal history is irrelevant" and that Detective Gill testified that all he did was obtain the phone records.  Drumgold objected but did not offer a reason for doing so.  On redirect examination, Detective Gill testified that after analyzing Archer's and Velasco's phone records, the police did not feel that there was any need to further investigate them.

that Velasco was Archer's new boyfriend who had "bad blood" with Williams and that Velasco had a prior criminal record. The circuit court inquired whether Drumgold had evidence indicating that Archer or Velasco were in the vicinity at the time of the murder. The defense proffered that Archer had made an accusation in January 2022 that Williams had inappropriately touched the child. The investigation into this accusation was ultimately terminated when it was discovered that it was actually Archer and Velasco hitting one another. The defense argued the domestic violence between Archer and Velasco relates to this case because it shows "their propensity to have violence." Drumgold also proffered that Velasco and Archer's phone records showed no phone calls from about 9:00 p.m. on March 22, 2022, until late afternoon on March 23, 2022. Additionally, the defense highlighted Archer's statement to police that she "wouldn't want to be with a murderer" and that Archer refused to tell Velasco where Williams lived because of Velasco's jealousy issues. Drumgold stated that Velasco and Archer did not have alibis, as they claimed, "they were both [sleeping] in the apartment [in Stafford] that morning."

The Commonwealth responded that the defense failed to proffer any evidence "that points directly to the guilt of either Ashley Archer, Edward[10] Velasco, or any other person." The Commonwealth also noted that the allegations of sexual abuse "were thoroughly investigated . . . [and were] unfounded" and that, around the time of the murder,[11] Archer's phone was active between "3:40 a.m. and 9:22 a.m. on the morning of the murder" and was "communicating with towers in Stafford, miles away from Alexandria."[12] Ultimately, the Commonwealth conceded

---

[10] The transcripts and pleadings spell Velasco's first name inconsistently, most often as "Eduard" and sometimes as "Edward."

[11] Williams "died somewhere about 5:45."

[12] At trial, Detective Kramarik testified as an expert in cell phone technology. He examined the cell phone records for Archer and Velasco. With respect to Archer's cell phone records, Detective Kramarik testified that there were no phone calls or text messages between 10:00 p.m. on March 22, 2022, and 7:00 a.m. on March 23, 2022. Detective Kramarik testified

that the defense could ask the detectives about the thoroughness of the investigation but that the defense had not proffered sufficient evidence to raise third-party guilt at trial. The circuit court granted the motion "unless or until [the defense] can make a proffer to the trial court that the trial court accepts, that there is some direct evidence that somebody else did this homicide."

The week before trial was to commence, Drumgold filed a motion in limine "request[ing] an outline and framework of what third party guilt evidence will be permitted to be introduced." The defense again proffered that there was a contentious relationship between Archer and Williams, that there was an ongoing child custody dispute between them, and that Archer had filed a police report accusing Williams of molesting their child. Drumgold also again noted Velasco's criminal record and the domestic violence history of Velasco and Archer. The Commonwealth responded that Drumgold's filing presented no new facts or evidence indicating that Archer or Velasco committed the murder and that such proffer was inadequate to allow the defense to raise third-party guilt at trial.

Before voir dire on the first day of trial, the circuit court addressed this motion and asked defense counsel what evidence would be used to prove the proffer and how that evidence was relevant to the case. The circuit court also asked the parties if either side anticipated having any evidence that Velasco or Archer was at or near the scene at the time of the murder. Drumgold stated that there was a surveillance video that showed "a male that could be [Velasco]." The Commonwealth responded that "[t]here is no direct evidence that either Ashley or . . . Eduard . . .

_____

that, based on the timing advance data, Archer's phone was located in Stafford, Virginia from 10:00 p.m. on March 22 until 7:00 a.m. the following morning. Velasco's cell phone records showed a phone call at 9:09 p.m. on March 22, 2022, and an outgoing text message at 6:09 a.m. on March 23, 2022. When asked where Velasco's cell phone was located when he sent the text message, Detective Kramarik replied, "According to the call detail records, it was in Stafford, Virginia." Detective Kramarik also examined Drumgold's cell phone records and testified that the timing advance records showed his phone was located in Alexandria, Virginia between 10:00 p.m. on March 22 and 7:00 a.m. the next morning. On cross-examination, Detective Kramarik stated that he did not know whether Archer or Velasco had any other phones.

- 14 -

was at or near the scene of the homicide on the morning of March 23." Ultimately, the court ruled that Drumgold was not permitted to present third-party guilt evidence but could question the police officers about their investigation. The Commonwealth then mentioned that cell phone records indicated that Archer and Velasco were in Stafford at the time of the murder. Drumgold asserted that the cell phone records show that no phone calls were made at the time of the murder. The circuit court stated that the parties could question the cell phone evidence at trial.

On May 21, 2024, the second day of trial, Detective Clinch testified on cross-examination that he spoke with other residents of the apartment building when he first arrived at the crime scene. According to Detective Clinch, "one resident saw somebody outside the building smoking a cigarette, or doing something, hanging out" at the time of the murder. Detective Clinch also testified that neighbors saw people walking by in the days prior to the shooting but stated that this was not unusual for a city. Drumgold then contended that "if there was a stranger hanging around with a big black bike sleeping in the general area in those canvasing works" and there were reports of break-ins, he should be permitted to question Detective Clinch about that information. The circuit court responded, "Go ahead. . . . Just ask him." Drumgold then stated that he would call Detective Clinch as a witness and resumed cross-examination. Drumgold did not ask those questions during the rest of cross-examination.

At the end of the third day of trial, the parties and the court discussed which witnesses would be needed the following day. Drumgold asked the court for clarification as to whether he would be able to question Archer and Velasco. The circuit court replied, "You're not allowed to put on any evidence of third party guilt, with regard to those two people. The Court has ruled on that repeatedly." On the next day of trial, the Commonwealth informed the court that Archer and Velasco were en route to the courthouse. The court informed the parties that Drumgold could ask Archer and Velasco whether they left their phones in Stafford at the time of the murder,

whether they were in Alexandria on the night or morning of the murder, and about communications with Williams.

After the Commonwealth rested and the circuit court denied the first motion to strike, Drumgold stated that he was still unclear as to what questions he could ask Archer and Velasco. The court responded that he could not "bring up, talk about third-party guilt" but noted that Drumgold could ask about communications between Archer and Williams or about whether Archer or Velasco "left their cell phones in Stafford . . . on the night of the murder." Drumgold stated that he would not ask Archer and Velasco whether they left their cell phones in Stafford. The Commonwealth informed the court that Archer and Velasco had arrived, but Drumgold then advised the court that he was not going to call either of them as witnesses.

C. Motion to Suppress

On May 9, 2024, the circuit court heard oral argument on the defense's motion to suppress the contents of the journals the defense alleged were unlawfully seized and any observations or statements made as a result of the seizure. In the written motion, the defense argued the seizure and search of the journals during the execution of the second search warrant exceeded the scope of the warrant, as the affidavit for that warrant did not request collection of journals. The Commonwealth responded that opening the journals did not exceed the scope of the second search warrant because such journals could contain documents relating to occupancy, which were requested in the affidavit for the search warrant.

At oral argument, Drumgold argued that the journals were not containers, and the writings were not in plain view. Drumgold also asserted that the police had already seized documents relating to occupancy, so they did not need to read the journals to find more documents relating to occupancy. The Commonwealth responded that the police could peruse the journals because such journals could contain folded documents relating to occupancy, and the

- 16 -

journals themselves could also have been indicia of occupancy. The circuit court denied the motion to suppress, stating "that the officers clearly acted within the scope of the warrant when the[y] read the journals."

### D. Fraternity-Related Evidence

At trial, Detective Clinch testified that, as part of the investigation, officers reviewed Drumgold's Instagram page with the username "Dontaethedon." Drumgold objected to the admission of the photos from his Instagram on the basis of relevance, and the Commonwealth responded that Drumgold held himself out as a member of a fraternity, which the police learned was untrue. The Commonwealth proffered that this was relevant because it was one of the many lies Drumgold told throughout the investigation, which showed that "he [was] trying to obfuscate and lead detectives away from the fact that he [was] the one that committed the murder." Additionally, the Commonwealth proffered that there were other exhibits that were also posted on Drumgold's public social media accounts showing Drumgold burying "a fraternity relic using a shovel and a pickax[e]." Drumgold argued that whether he lied about being in a fraternity or not was irrelevant because the case was not about dishonesty or cheating. The circuit court overruled the objection, stating that "credibility is always an issue." Drumgold then also objected to this evidence, arguing that the exhibits were overly prejudicial. The circuit court overruled this objection.

Detective Clinch further testified that one of the photos posted on Drumgold's Instagram with the username "kingofthekappas" was of a flag with Greek letters, which was the same flag seen in Drumgold's bedroom. When the Commonwealth moved to admit these photographs, Drumgold objected on the same grounds, and the circuit court overruled the objection. Drumgold's Instagram page also had photos of him burying a "fraternity relic." Detective

Clinch then testified, without objection, that he was unable to confirm whether Drumgold was in a fraternity and found no evidence of his membership in a fraternity.

David Allen, a crime scene investigator, testified about retrieving the buried "fraternity relic." Drumgold objected on the basis of relevance, but the circuit court overruled the objection. Later, Detective Clinch also testified about digging up the "fraternity relic" on March 30, 2022, without objection from the defense.

Detective Gill testified that Drumgold presented himself as a member of a fraternity, and the defense did not object to this testimony. Additionally, Detective Gill testified, without objection, that the police spoke with Drumgold's parents, who stated that Drumgold was not a member of the Kappa fraternity.

E. Motion to Strike

After the Commonwealth rested, Drumgold moved to strike, arguing that there was no weapon, no bullet casings, no fingerprints, and no blood spatter. He also argued that there was no proof of motive and that the entries in the notebooks showed Drumgold "simply writing about what he was reading and the movies." Drumgold explained that "he was trying to make money off of" the writings in the notebooks. The circuit court denied the motion.

After Drumgold's testimony, he rested and renewed his motion to strike, referencing *Bishop v. Commonwealth*, 227 Va. 164 (1984). Drumgold then stated, "I do not believe they met the sufficient Commonwealth code." The circuit court again denied the motion.

F. Jury Deliberations and Sentencing

After closing arguments on May 23, 2024, the jury recessed for deliberations. On May 24, 2024, the jury found Drumgold guilty of first-degree murder and the use of a firearm in the commission of a felony.

After trial, Drumgold retained new counsel, and the sentencing hearing was continued to November 21, 2024. On November 15, 2024, Drumgold filed a new motion for a competency evaluation. Shortly thereafter, the Commonwealth filed an objection to this motion. On November 21, 2024, the circuit court heard oral argument. Drumgold's counsel stated that Drumgold had made unusual statements like "he was married to 106" women and that he was Jewish, described as "odd" given Drumgold's "history." The Commonwealth objected to the motion, arguing that no evaluation was necessary because no change in circumstances had occurred. The circuit court denied the motion, stating that "odd behavior doesn't equate to a lack of competency to stand trial or a lack of competency to stand for sentencing." The court additionally noted that "[t]he timing of the two competency motions, one immediately preceding trial and one immediately preceding sentencing, I think buttresses the notion contained in the Stormer report that there is some malingering going on." Drumgold's sentencing was continued.

On January 3, 2025, Drumgold filed a renewed motion for a competency evaluation and attached the medical records from Drumgold's hospitalization at Western State Hospital in July 2020. At the sentencing hearing on January 9, 2025, the circuit court asked Drumgold if he wanted to allocute. In response, Drumgold stated,

> I have paperwork that I remember during the case that said if the case was circumstantial or the entire situation was circumstantial, that you would grant a—that my attorney, from my first attorneys, pretty much provided—I don't—I'm trying to see if that still is valid and then this is my new attorney and he is providing his game plan on what the Commonwealth is trying to do.
>
> The Commonwealth is trying to give me a life sentence and what he is trying to do is he is attempting to rid that. I understand he's trying to keep it at a 25-year mark, but he's trying to rid the aspect of a life sentence because he keeps telling me it is harder to fight that than a year's time period.

The court interrupted Drumgold, discouraging him "from conveying any communications [he] had with [his] lawyer," as those communications are privileged. Drumgold continued, stating that his paperwork showed he "received a grant due to the case being circumstantial." Drumgold's counsel then stated that this was the kind of communication that prompted the competency evaluation motion and clarified that when the court granted a certain jury instruction, it seemed that Drumgold "believe[d] that in granting that instruction, the Court granted an acquittal." Drumgold finished his allocution. The circuit court sentenced Drumgold to 60 years, with 10 years suspended, on the first-degree murder conviction and 3 years for the use of a firearm conviction, for a total sentence of 53 years of active incarceration.

ANALYSIS

*I. Third-Party Guilt Evidence (Assignment of Error 1)*

Drumgold contends the circuit court erred by precluding him from presenting evidence that someone else, principally Ashley Archer or Eduard Velasco, murdered Williams, and he argues the ruling abridged his constitutional right to present a defense. On this claim, we disagree.

Decisions on the admissibility of evidence rest within the sound discretion of the circuit court and will not be disturbed absent an abuse of that discretion. *Atkins v. Commonwealth*, 68 Va. App. 1, 7 (2017). Only when reasonable jurists could not differ does an abuse of discretion occur, though a court by definition abuses its discretion when it makes an error of law, and evidentiary questions of law are reviewed de novo. *Nottingham v. Commonwealth*, 73 Va. App. 221, 231 (2021).

An accused enjoys the right "to call for evidence in his favor." Va. Const. art. I, § 8; *Massey v. Commonwealth*, 230 Va. 436, 442 (1985). That right, however, does not extend to evidence which merely insinuates the guilt of another. In Virginia, evidence a crime was

- 20 -

committed by someone other than the accused is admissible to generate a reasonable doubt, but the evidence "*must point directly* to guilt of a third party," and only where a "trend of facts and circumstances [tends] *clearly to point out some other person* as the guilty party" may the accused introduce such proof. *Juniper v. Commonwealth*, 271 Va. 362, 411 (2006) (quoting *Weller v. Commonwealth*, 16 Va. App. 886, 890 (1993)). Although circumstantial evidence of a third party's guilt is to be "liberally received" once that threshold is met, the proffered evidence must still be legally admissible, and its admission lies in the circuit court's discretion. *Id.* The proffer need not prove a third party committed the offense; it need only raise a question for the jury whether a reasonable doubt of the accused's guilt exists. *Ramsey v. Commonwealth*, 63 Va. App. 341, 353-55 (2014). Notwithstanding, proffered evidence which merely suggests several third parties may have committed the offense is inadmissible because it tends to confuse and mislead the jury into speculation. *Johnson v. Commonwealth*, 259 Va. 654, 681 (2000).

Binding precedent marks the boundary of admissibility of third-party guilt evidence. In *Karnes v. Commonwealth*, 125 Va. 758, 764-67 (1919), the Supreme Court reversed where the circuit court excluded evidence a third party had threatened the victim, that the victim feared him, that he followed her on the evening of the murder, and that he possessed a pistol and sought to buy cartridges for it shortly before the killing. In *Oliva v. Commonwealth*, 19 Va. App. 523, 525-29 (1995), this Court reversed where the circuit court excluded a witness's testimony that a person who resembled a third party, and not the defendant, was seen fleeing the scene. And in *Tice v. Commonwealth*, 38 Va. App. 332, 342 (2002), the third party's own confession and a letter admitting the killing pointed directly to his guilt. On the other side of the line, the Supreme Court affirmed exclusion in *Johnson*, 259 Va. at 681, where the proffer showed only a poor relationship between the victim and a third party, and in *Juniper*, 271 Va. at 412, where the questioning referred only to "foot traffic" and the presence of unidentified persons at unknown

times. This Court likewise affirmed exclusion in *Jordan v. Commonwealth*, 84 Va. App. 446, 468 (2025), holding a victim's statement bearing on motive, unaccompanied by any evidence connecting the third party to the offense, did not point directly to guilt.

Drumgold's proffer falls on the *Johnson* side of the line. As to Archer, he proffered a custody dispute with the victim; an accusation she had lodged against the victim, which was investigated and terminated; and the absence of an alibi. As to Velasco, he proffered "bad blood" with the victim, a criminal record, a history of domestic violence with Archer, and the absence of an alibi. This is evidence of motive and, at most, opportunity. It does not point directly to either person as the killer. When the circuit court asked the parties whether either side had evidence placing Archer or Velasco at or near the scene when the offense occurred, Drumgold could offer only a surveillance image of a male who "could be" Velasco. That speculative identification is materially weaker than the eyewitness testimony found sufficient in *Oliva*. At the same time, the unrebutted cell-site evidence placed Archer's and Velasco's telephones in Stafford, miles from Alexandria, from the night before the murder through the morning it occurred. Nothing in the proffer served to point the jury toward a particular third party as the guilty agent, as *Karnes*, *Oliva*, and *Tice* require.

Drumgold's attempt to distinguish *Johnson* on the ground that the Commonwealth there possessed DNA evidence misapprehends that decision. *Johnson*, 259 Va. at 681. The elimination of the third party by DNA was an additional reason for the exclusion; the controlling one was that a proffer tending to show only a strained relationship or possible motive bears no direct relation to the crime charged and invites the jury to speculate. *Id.*; *see also Oliva*, 19 Va. App. at 527. That principle applies with equal force whether the Commonwealth's proof is forensic or circumstantial, and Drumgold's showing of motive and missing alibis is the same order of speculation the Supreme Court found wanting in *Johnson*.

*Ramsey*, 63 Va. App. at 355-56, likewise forecloses Drumgold's reliance upon it. The defendant there offered considerably more than Drumgold does: a third party with a prior conviction for a sexual offense against a child, on probation and untreated, whom the defendant testified he had seen carry the victim into the woods near the scene. This Court nonetheless held the showing did not point clearly or directly to the third party and affirmed the exclusion. *Id.* The alternative harmless-error rationale rested on the Commonwealth's forensic proof, but the threshold holding did not, and it controls here. *Id.* at 356-57.

Because Drumgold's proffered evidence did not clear the threshold of pointing directly to a third party, it was not admissible, and the constitutional right to present a defense supplied no basis for its admission. The right "to call for evidence in [one's] favor" does not permit a defendant to introduce evidence which merely insinuates a third party may have committed the crime. *Id.* at 353-54. We therefore do not reach a separate constitutional analysis, because the constitutional claim rises and falls with the evidentiary ruling.[13] The threshold we apply is a settled and non-arbitrary evidentiary standard, and its even-handed application by the circuit court to Drumgold's proffer did not render his trial fundamentally unfair.

We note, additionally, the circuit court's ruling was not a blanket exclusion. The court permitted Drumgold to probe the thoroughness of the police investigation and to ask Archer and Velasco about their whereabouts on the morning of the murder, whether they had left their telephones in Stafford, and the nature of their communications with the victim. Drumgold

---

[13] The constitutional right to present a defense supplies no separate basis for admission here. "Combined, the rights to compulsory process, confrontation and due process give the defendant a constitutional right to present relevant evidence." *Neeley v. Commonwealth*, 17 Va. App. 349, 356 (1993). That right is not unlimited, however; the accused "must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973); *see Neeley*, 17 Va. App. at 356 (relying on *Chambers*). The proffer having been excluded under a settled and evenhandedly applied evidentiary standard, the constitutional claim rises and falls with that ruling.

declined to call either witness and declined to ask the permitted questions. The circuit court did not abuse its discretion, and we affirm its judgment as to Assignment of Error 1.

## II. Motion to Suppress (Assignment of Error 2)

Drumgold next contends that the circuit court improperly denied the motion to suppress the search and seizure of his journals. He argues that the officers' review of the journals during the execution of the second search warrant exceeded the scope of that warrant, as that warrant did not specifically request seizure of journals or other writings. Drumgold further contends that perusal of the journals for documents related to indicia of occupancy was not necessary due to "the discovery and seizure of the billing document, eviction notice and tax document." Finally, Drumgold asserts that the issuance of the subsequent search warrant for the contents of the journals does not cure the unconstitutional search, as the basis for that search warrant was the contents of the journals discovered unlawfully during the execution of the second search warrant.

The Commonwealth responds that officers may open containers that may conceal objects requested in a search warrant. In this case, officers "reasonably read the contents of the journals to determine if they contained 'paperwork related to possession and purchasing of the firearms' or 'indicia of occupancy.'" Once the police determined that the journals did not contain documentation relating to firearms or occupancy, police stopped reading the journals and obtained a search warrant for their contents. The Commonwealth further responds that there is no authority stating that officers cannot look for additional items upon finding one or more items requested in the search warrant.[14]

---

[14] In a footnote, the Commonwealth asserts that it is arguable that the journals themselves were documents relating to occupancy. This Court declines to address this contention, as it is clear the police were acting within the scope of the second search warrant when they opened the journals.

Upon review of a denial of a motion to suppress, this Court defers to the circuit court's factual findings unless they are plainly wrong or without evidence to support them but reviews the circuit court's determination of whether the Fourth Amendment was violated based on the facts de novo. *Williams v. Commonwealth*, 71 Va. App. 462, 474-75 (2020); *Knight v. Commonwealth*, 61 Va. App. 297, 305 (2012); *McGee v. Commonwealth*, 25 Va. App. 193, 197-98 (1997) (en banc).

Under the Fourth Amendment, "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another." *Stanford v. Texas*, 379 U.S. 476, 485 (1965) (quoting *Marron v. United States*, 275 U.S. 192, 196 (1927)); *see also United States v. Griffith*, 867 F.3d 1265, 1275 (D.C. Cir. 2017) ("The Fourth Amendment requires that warrants 'particularly describ[e]' the 'things to be seized.' That condition 'ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit.'" (citation omitted) (alteration in original) (quoting *Maryland v. Garrison*, 480 U.S. 79, 84 (1987))).

"The permissible scope of a search is limited by the terms of the warrant pursuant to which it is conducted." *Kearney v. Commonwealth*, 4 Va. App. 202, 204 (1987). "A lawful search of premises described in a warrant," however, "extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search." *Id.* at 205 (quoting *United States v. Ross*, 456 U.S. 798, 820-21 (1982)). Thus, "[a] search may be as extensive as reasonably required to locate the items described in the warrant." *Id.* (quoting *United States v. Wuagneux*, 683 F.2d 1343, 1352 (11th Cir. 1982)).

As such, officers may seize and open items not named in the warrant that may contain the items that were requested in the warrant. *See Beavers v. Commonwealth*, 245 Va. 268, 276 (1993) (holding that trial court correctly rejected the assertion that officers exceeded the scope of a warrant requesting "bloodstained white medical gauze tape" when they opened a pouch); *Rosa v. Commonwealth*, 48 Va. App. 93, 100-02 (2006) (holding that police were "entitled to examine all of appellant's files to determine whether they contained items that fell within the scope of the initial warrant"); *Dotson v. Commonwealth*, 47 Va. App. 237, 243-44 (2005) (holding that seizure of defendant's safe was within scope of warrant that requested "items related to the possession, distribution, or manufacture of marijuana, or any other illicit drugs" because "the safe was a container that officers reasonably believed contained items specified in the warrant, particularly illicit drugs, drug paraphernalia, and records of illegal drug sales"); *Kearney*, 4 Va. App. at 203, 205-06 (holding that "the searches of the closed containers found in the bumper and in the bed of the [defendant's] truck were within the mandate of the warrant," which authorized the search of defendant's residence and curtilage "for cocaine and paraphernalia associated with its distribution").

Once the police have determined that an item does not fall under the purview of the warrant, the examination of such item must cease until the police can lawfully examine it again. *See Holloman v. Commonwealth*, 221 Va. 947, 949 (1981) (holding that the search of the "real small bags" and warrantless seizure of the contraband contained within was unlawful because "it was the product of a deliberate search into 'spaces which obviously could not hide' the things which were . . . legitimate objects of the search"); *United States v. Slocum*, 708 F.2d 587, 604 (11th Cir. 1983) (adopting standard from D.C. Circuit and Second Circuit that "an officer acting pursuant to such a warrant is entitled to examine any document he discovers, but that 'the

- 26 -

perusal must cease at the point of which the warrant's inapplicability to each document is clear'" (quoting *United States v. Heldt*, 668 F.2d 1238, 1267 (D.C. Cir. 1981))).

In *Rosa*, 48 Va. App. 93, this Court established the governing procedure where officers, executing a search warrant, encounter writings or files that may or may not fall within the warrant's scope. There, police executed a search warrant for the defendant's computer to look for files containing information on digital conversations between the defendant and a college student, relative to charges of distribution of controlled substances and providing alcohol to a minor. *Id.* at 95-96. During that search, officers viewed an image believed to be child pornography, immediately ceased their review of the picture files, and obtained a second warrant to search for sexually explicit images of children. *Id.* at 97. This Court found "no error in this procedure," explaining that "[i]t is certain that some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized." *Id.* at 100-02 (quoting *Andresen v. Maryland*, 427 U.S. 463, 482 n.11 (1976)). Such perusal may continue only so far as that determination requires, and must cease once a writing's inapplicability to the warrant is apparent.

The officers here followed that same procedure. Based on the size of Drumgold's journals, the officers reasonably believed the journals might contain papers relating to the purchase and possession of firearms or to occupancy of the apartment, items listed in the second search warrant. After examining the journals cursorily and determining they contained no item responsive to the second warrant, the officers ceased reading and obtained a third warrant for the journals' contents. That procedure mirrors precisely what this Court approved in *Rosa*.

Drumgold argues that the third search warrant circumvents the Fourth Amendment because it was supported only by contents observed during execution of the second warrant. *Rosa* forecloses that argument. Because the officers were permitted to examine Drumgold's

journals to determine whether they fell within the scope of the second warrant, the observations made during that examination provided a proper basis for the third warrant.

Finally, Drumgold contends that, because the officers had already collected documents indicating occupancy, there was no need for the police to examine the journals to find more documents relating to occupancy. Drumgold provides no authority for this assertion, and caselaw on the scope of warrants suggests that officers are not categorically barred from looking for additional items that fall within a warrant's scope. *See Jeffers v. Commonwealth*, 62 Va. App. 151, 156 (2013) ("Police officers executing a particularized search warrant need not read its scope either narrowly or broadly, only reasonably."); *Hoffa v. United States*, 385 U.S. 293, 310 (1966) ("Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction."). The warrant in this case did not limit the number of items the police were allowed to seize to satisfy the search warrant, and there does not appear to be any authority requiring the police to cease their search once some documents have already been found. Thus, the circuit court did not err in denying the motion to suppress, and we affirm its ruling as to Assignment of Error 2.

### III. Introduction of the Fraternity Evidence (Assignment of Error 3)

Under the third assignment of error, Drumgold argues the Commonwealth's introduction of evidence regarding his representation of fraternity membership was irrelevant and impermissible character evidence of lying. In his view, because he never testified, put his credibility in issue, or introduced his own prior recorded statements, the Commonwealth could not present evidence that he was a liar. The Commonwealth responds that Drumgold waived this assignment of error because Drumgold failed to object to testimony concerning his fraternity representations after he

initially objected when the evidence was first raised.  Additionally, the Commonwealth asserts that any argument concerning the barring of character evidence under Rule 2:404(a) was not sufficiently preserved, as Drumgold never raised the argument to the circuit court.

"It is a well settled and obviously *sound general rule that an objection to evidence cannot be availed of by a party who has*, at some other time during the trial, voluntarily elicited the same evidence, or has *permitted it to be brought out by his adversary without objection*."  *Burns v. Bd. of Supervisors*, 227 Va. 354, 363 (1984) (quoting *Whitten v. McClelland*, 137 Va. 726, 741 (1923)).

Detective Clinch testified that during the first police interview with Drumgold, Drumgold did not allow the police to copy the data from his phone because he did not want people to see "some notes about a fraternity."  Drumgold did not object to this.  Shortly thereafter, the Commonwealth moved to admit screenshots of Drumgold's Instagram page that included fraternity-related evidence, which Drumgold objected to on the basis of relevance and prejudice. Detective Clinch then testified, without objection, that he could not confirm Drumgold's membership and found no evidence of it, the very testimony establishing the falsity of the fraternity claim that Drumgold challenges on appeal.  Subsequently, Drumgold objected on the basis of relevance when the Commonwealth moved to admit photographs of the police digging up the "fraternity relic."  When the Commonwealth recalled Detective Clinch and he testified about uncovering the "fraternity relic," Drumgold did not object.  Detective Clinch also testified that because police found "a shovel, a pickaxe and some muddy boots" in Drumgold's car, they dug up the "fraternity relic" to see if a weapon was also buried.  Drumgold again did not object.  Detective Gill also testified about fraternity-related evidence with no objection from Drumgold.  Thus, Drumgold's argument that the fraternity evidence was irrelevant is waived on appeal.  Each of these instances arose during the Commonwealth's own presentation of the evidence, and not on

Drumgold's cross-examination, so the waiver rests on his failure to object to the Commonwealth's repeated introduction of the same evidence.

Under Rule 5A:18, "[n]o ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice." Additionally, "[m]aking one specific argument on an issue does not preserve a separate legal point on the same issue for [appellate] review." *Jones v. Commonwealth*, 71 Va. App. 597, 607 (2020) (alterations in original). Because Drumgold never objected to the fraternity evidence as impermissible character evidence, his argument concerning Rule 2:404(a) was not sufficiently preserved for appellate review. Because the relevance objection was waived and the character-evidence argument was not preserved, we do not reach the merits of either contention, and we affirm the circuit court as to Assignment of Error 3.

### IV. Sufficiency of the Evidence—First-Degree Murder (Assignment of Error 4)

Drumgold contends the circuit court erred in denying his motion to strike the evidence on Count I because the Commonwealth's case was wholly circumstantial and failed to exclude every reasonable hypothesis of innocence. On this claim, we disagree.

A motion to strike tests the legal sufficiency of the evidence, and in a jury trial the court does not err in denying the motion when the Commonwealth has presented a prima facie case for the fact finder's consideration. *Vay v. Commonwealth*, 67 Va. App. 236, 249 (2017). When the sufficiency of the evidence is challenged, "[t]he only 'relevant question is . . . whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024) (alterations in original) (quoting *Sullivan v. Commonwealth*, 280 Va. 672, 676 (2010)). We review the evidence in the light most favorable to the Commonwealth, discard the evidence of the accused in conflict with that of the

Commonwealth, and regard as true all credible evidence favorable to the Commonwealth and all fair inferences to be drawn from it. *Commonwealth v. Barney*, 302 Va. 84, 96-97 (2023). The judgment "is presumed correct and will not be disturbed unless it is 'plainly wrong or without evidence to support it.'" *Garrick*, 303 Va. at 182 (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)). The inquiry "does not distinguish between direct and circumstantial evidence," and "[a] conviction may rest on circumstantial evidence alone." *Id.* at 183 (quoting *Commonwealth v. Moseley*, 293 Va. 455, 463 (2017)). The Commonwealth bears the burden of proving the identity of the accused as the perpetrator beyond a reasonable doubt. *Cuffee v. Commonwealth*, 61 Va. App. 353, 364 (2013).

Where the Commonwealth's case is circumstantial, all necessary circumstances proved must be consistent with guilt and inconsistent with innocence, and the evidence must exclude every reasonable hypothesis of innocence. *Higginbotham v. Commonwealth*, 216 Va. 349, 352-53 (1975); *Turner v. Commonwealth*, 218 Va. 141, 145-46 (1977). The Supreme Court has repeatedly reaffirmed that longstanding formulation, which is "simply another way of stating that the Commonwealth [bears] the burden of proof beyond a reasonable doubt." *Commonwealth v. Wilkerson*, 304 Va. 92, 101-02 (2025) (quoting *Moseley*, 293 Va. at 464). The hypotheses the Commonwealth must exclude, however, are those which flow from the evidence itself and not from the imaginings of counsel, and whether a hypothesis of innocence is reasonable is a question for the fact finder, who weighs the evidence and determines the inferences it reasonably yields. *Tyler v. Commonwealth*, 254 Va. 162, 166 (1997); *Wilkerson*, 304 Va. at 102. So long as the fact finder's rejection of a proffered hypothesis as unreasonable is not arbitrary, the principle furnishes no basis for an appellate court to invade the fact finder's province. *Cuffee v. Commonwealth*, ___ Va. ___, ___ (Apr. 16, 2026) [hereinafter *Cuffee 2026*]. A reviewing court does not reweigh the evidence or substitute its own judgment for the fact finder's; it enforces the

Commonwealth's burden of proof. *Commonwealth v. Richerson*, ___ Va. ___, ___ (Apr. 23, 2026); *Garrick*, 303 Va. at 182. The Commonwealth is not required to produce a confession, eyewitness testimony, or forensic proof such as DNA; it need only adduce circumstantial evidence sufficient for a reasonable jury to reject the accused's claim of innocence. *Davis v. Commonwealth*, 65 Va. App. 485, 502 (2015).

First-degree murder includes "any willful, deliberate, and premeditated killing." Code § 18.2-32. Drumgold does not dispute Williams was unlawfully killed; he disputes that he was the criminal agent and that the killing was premeditated. The evidence, viewed under the governing standard, permitted a rational jury to find both.

The medical examiner determined Williams died of a single gunshot wound near his left eye, and the recovered fragments were consistent in design with a .22 caliber rifle round. The Commonwealth tied the means of death to Drumgold. He purchased a .22 caliber Remington rifle in October 2021 and, on receiving it, remarked he "could blow a nigga's head off." He purchased .22 caliber rifle ammunition the following month. Police recovered .22 caliber rounds and a cartridge from the apartment and Drumgold's bedroom, together with a gun cleaning kit whose .17 and .22 caliber brushes were dirty and bore traces of gunshot residue. The rifle itself was never recovered. Expert testimony established a .22 caliber round produces less noise than a larger caliber, a circumstance from which the jury could explain the absence of any reported gunshot.

The evidence supplied a motive and an opportunity. Drumgold and Williams were in arrears on the rent and faced an eviction set to take effect on March 23, 2022, the very day of the murder; they had previously quarreled over Drumgold's discharging a firearm in the apartment, which left a bullet in Williams's door; and three days before the killing, Drumgold's mother urged him to "control yourself and try to move instead of going to jail and losing everything."

Drumgold lived in the shared apartment, had access to a fire escape from his bedroom, and his telephone was located in Alexandria on the morning of the murder while he had been awake until approximately 4:00 a.m. searching apartment and firearm websites. Williams was shot at the building entrance as he left for his 5:45 a.m. work shift.

The jury also heard evidence of guilty knowledge and consciousness of guilt. When detectives asked Drumgold what he thought had happened to Williams, he answered that Williams had been shot, information not yet disclosed to him or made public; the jury could infer only the perpetrator would have known this fact. Drumgold gave demonstrably false and shifting accounts: he placed his last contact with Williams at two days, then a week, then six days, in the course of a single conversation; he claimed to have gone to sleep at 11:30 p.m. and later at 3:00 or 4:00 a.m., contradicted by his telephone activity; he falsely asserted he could not possess a firearm because he was a felon; he falsely denied purchasing .22 caliber ammunition; and he claimed not to remember what became of the rifle he had purchased. A fact finder may conclude that even a non-testifying defendant's false statements show he has lied to conceal his guilt. *Rams v. Commonwealth*, 70 Va. App. 12, 27 (2019); *Iglesias v. Commonwealth*, 7 Va. App. 93, 110 (1988). The jury was likewise entitled to treat Drumgold's professed inability to recall the fate of the rifle as feigned. *Hooper v. Commonwealth*, 78 Va. App. 508, 518-19 (2023).

A killing is murder of the first degree when it is willful, deliberate, and premeditated, but the intention to kill need not exist for any measurable length of time before the act; it may be formed at the moment of the killing, for "[i]t is the will and purpose to kill and not the interval of time which fixes the grade of the offense." *Bailey v. Commonwealth*, 191 Va. 510, 516-17 (1950); *see also Hairston v. Commonwealth*, 217 Va. 429, 431-32 (1976). The same record supported the finding of premeditation. Drumgold's journals described learning a target's daily

routine in order to "whack" him, directed that one "[s]hoot bullet to make sure there is no serial number on it," and recorded that he "prefer[red] a bullet to the head," that "the game is only fun if you don't get caught," and that he "prefer[red] to dig the hole before blowing someone's brains out." Police recovered a shovel, pickaxe, tarp, and muddy boots from the trunk of Drumgold's car. From this evidence the jury could find a deliberate and premeditated design rather than an impulsive act.

Drumgold's contention that the evidence left open a reasonable hypothesis of innocence, namely that his journals were merely creative writing, was a matter for the jury, which was entitled to reject it. Because the jury's rejection of that hypothesis was not arbitrary but grounded in the evidence, the reasonable-hypothesis principle affords Drumgold no relief. *Cuffee 2026*, ___ Va. at ___; *Richerson*, ___ Va. at ___. His reliance on *Turner*, 218 Va. at 146-47, and *Sutphin v. Commonwealth*, 1 Va. App. 241, 247-48 (1985), is of no help to his cause. In each, a single item of forensic evidence, a fingerprint or the generic mode of breaking a glass door, required additional circumstances tending to establish criminal agency before a conviction could stand. Here the circumstances of Drumgold's criminal agency, already detailed, are numerous and convergent. The absence of a recovered weapon, eyewitness, confession, or conclusive forensic link is thus not dispositive. *Davis*, 65 Va. App. at 502.

A rational trier of fact could find beyond a reasonable doubt that Drumgold was the criminal agent and that the killing was willful, deliberate, and premeditated. The jury's verdict was neither plainly wrong nor without evidence to support it. We thus affirm the circuit court as to Assignment of Error 4.

*V. Sufficiency of the Evidence—Use of a Firearm (Assignment of Error 5)*

Drumgold contends the circuit court erred in denying his motion to strike Count II of the indictment. He expressly incorporated his Count I argument and advanced no separate challenge to the firearm element. The same standard of review governs. *Garrick*, 303 Va. at 182.

It is unlawful to "use or attempt to use any pistol, shotgun, rifle, or other firearm" while committing or attempting to commit murder. Code § 18.2-53.1. Two propositions resolve this assignment. First, for the reasons stated in Part IV, the evidence was sufficient for a rational jury to find Drumgold the criminal agent of Williams's murder, the predicate felony. Second, the manner of the killing established the use of a firearm: the medical examiner found a fatal gunshot wound to the head, and the recovered fragments were consistent with a .22 caliber rifle round. A rifle is a firearm within the meaning of Code § 18.2-53.1. The evidence that supports the murder conviction therefore supports the finding that Drumgold used a firearm to commit it.

We therefore affirm the circuit court as to Assignment of Error 5.

*VI. Second Competency Evaluation (Assignment of Error 6)*

In his last assignment of error, Drumgold argues the circuit court erred by denying his second motion for a competency evaluation on November 21, 2024. Drumgold asserts he offered the following new information to the circuit court in support of the motion: (1) Drumgold was not sent to Western State Hospital in 2020 for treatment of a head injury but was sent there "due to defense and Commonwealth concerns over his mental capacity"; (2) Drumgold has "a family history of mental illness, including Schizophrenia, Asperger[']s and Bipolar Disorders"; and (3) Drumgold made statements to counsel like that "he was married to 106" women and was Jewish. Drumgold contends that his statements to his counsel and during allocution highlight his incompetence.

The Commonwealth responds that the circuit court "observed Drumgold throughout trial, at the hearing requesting the second competency evaluation, and at sentencing and could determine whether or not there was probable cause to order a second competency evaluation." The Commonwealth also asserts Drumgold's counsel never proffered that Drumgold was unable to assist counsel in his defense and only stated that Drumgold made "odd" statements. Finally, the Commonwealth states that the timing of the two motions for a competency evaluation and the results of the first competency evaluation further underscores that the circuit court did not abuse its discretion in denying the second motion for a competency evaluation.

"[T]he Due Process Clause of the Fourteenth Amendment prohibits the criminal prosecution of a defendant who is not competent to stand trial." *Dang v. Commonwealth*, 287 Va. 132, 144 (2014) (quoting *Medina v. California*, 505 U.S. 437, 439 (1992)). States are thus required to "provide criminal defendants 'access to procedures for making a competency evaluation.'" *Id.* at 144-45 (quoting *Medina*, 505 U.S. at 449). Virginia's procedure is codified in Code § 19.2-169.1. That statute states,

> If, at any time after the attorney for the defendant has been retained or appointed and before the end of trial, the court finds, upon hearing evidence or representations of counsel for the defendant or the attorney for the Commonwealth, that there is probable cause to believe that the defendant . . . lacks substantial capacity to understand the proceedings against him or to assist his attorney in his own defense, the court shall order that a competency evaluation be performed.

Code § 19.2-169.1(A). Under the Code, "a defendant must show by a preponderance of the evidence that he either lacks the [present] capacity to understand the criminal proceedings against him or lacks the ability to assist counsel in his defense." *Grattan v. Commonwealth*, 278 Va. 602, 616 (2009). Trial courts should consider "counsel's opinion on a client's competency," "evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial." *Clark v. Commonwealth*, 73 Va. App. 695, 708-09 (2021) (quoting

*Drope v. Missouri*, 420 U.S. 162, 180 (1975)). "When the defendant has already been afforded a competency evaluation in which he is found competent, the circuit court need not order a second evaluation unless it is presented with a substantial change in circumstances." *Dang*, 287 Va. at 145.

On appeal, a trial court's decision to deny a competency evaluation is reviewed for abuse of discretion, and the evidence is viewed "in the light most favorable to the Commonwealth." *Grattan*, 278 Va. at 616-17; *Clark*, 73 Va. App. at 705.

> [A] circuit court abuses its discretion "when a relevant factor that should have been given significant weight is not considered; when an irrelevant or improper factor is considered and given significant weight; and when all proper factors, and no improper ones, are considered, but the court, in weighing those factors, commits a clear error of judgment."

*Dang*, 287 Va. at 146 (quoting *Landrum v. Chippenham & Johnston-Willis Hosps.*, 282 Va. 346, 352 (2011)). The abuse of discretion standard of review recognizes that "a trial court is in the best position to weigh the evidence presented on a defendant's competency." *Clark*, 73 Va. App. at 705.

Here, the circuit court did not abuse its discretion by denying the second competency motion because counsel did not proffer a substantial change in circumstances. Before trial, Drumgold received a competency evaluation. Dr. Stormer's report addressed the same mental-health history later urged in support of the second motion, noting Drumgold's reported hospitalization for a head injury and the presence of a medication commonly used to treat bipolar disorder. Dr. Stormer concluded that Drumgold was likely feigning symptoms of mental illness, given his "logical and organized" thought process and his ability "to engage in rational discussion." She also noted that Drumgold's reported symptoms were "inconsistent with what is typically reported by individuals experiencing genuine psychosis."

At the hearing on the second motion, counsel proffered three grounds: the mental-health basis for the Western State referral, Drumgold's family history of mental illness, and his unusual statements to counsel. In denying the motion, the circuit court stated, "odd behavior doesn't equate

to a lack of competency to stand trial or a lack of competency to stand for sentencing." The circuit court also noted that the timing of the two motions "buttresses the notion contained in the Stormer report that there is some malingering going on." Finally, the circuit court highlighted that no evaluation of Drumgold was performed while he was at Western State Hospital, which raised "some concern as to whether there was a reason for that hospitalization." The court's reference to the timing of the two motions did not amount to the weighing of an improper factor, for the denial did not rest on timing alone; it rested as well on the findings in Dr. Stormer's evaluation, on the absence of any substantial change in circumstances, and on the court's own observation of Drumgold throughout the trial and the post-trial proceedings.

During Drumgold's allocution at the sentencing hearing, Drumgold's counsel noted to the court that his statements were of the kind that prompted the competency evaluation and that Drumgold believed he was acquitted. Although prior to the sentencing hearing, Drumgold filed a renewed motion for a competency evaluation, Drumgold's counsel did not ask for this during allocution.

Finding no error with respect to Assignment of Error 6, we affirm the circuit court's denial of a second competency evaluation.

CONCLUSION

For the foregoing reasons, the judgment of the circuit court is affirmed.

*Affirmed.*